IN THE UNITED STATES DISTRICT COURT FOR 
 THE MIDDLE DISTRICT OF ALABAMA 
 SOUTHERN DIVISION 

LATESHA WEATHERINGTON, ) 
 ) 
 Plaintiff, ) 
 ) 
 v. ) Case No. 1:19-cv-414-RAH-SMD 
 ) (WO) 
DOTHAN CITY BOARD OF ) 
EDUCATION, ) 
 ) 
 Defendant. ) 

 MEMORANDUM OPINION AND ORDER 

I. INTRODUCTION 
Plaintiff LaTesha Weatherington (“Weatherington”) brings this employment 
discrimination action against Defendant Dothan City Board of Education (the 
“Board” or “DCS”). Before the Court is the Board’s Motion for Summary Judgment 
(“Motion”). (Doc. 18.) The motion has been briefed and is ripe for review. For the 
reasons stated more fully below, the motion is due to be granted. 
II. FACTUAL BACKGROUND 
Weatherington is presently employed as a school principal by DCS, for whom 
she has worked continuously, albeit in various positions, since 2003. (Doc. 18-1, p. 
49; Doc. 1, p. 4.) Weatherington, a black female, filed this suit after applying for, 
and being subsequently rejected from, several job openings within the DCS school 
system. She submits two explanations for the Board’s decision to hire other 
candidates. The first is race discrimination, which she alleges pursuant to both 42 
U.S.C. §1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 

§ 2000e, et seq., and the second is retaliation, which she also alleges pursuant to 
Title VII. (See Doc. 1.) Weatherington separately asserts that the Board awarded 
higher salaries to two of her male comparators in violation of the Equal Pay Act, 29 

U.S.C. § 206(d). (Id., p. 10.) 
DCS offers a more innocent explanation for hiring other candidates. 
According to several of the DCS personnel responsible for hiring, neither race nor 
retaliation played a role in the Board’s review of applications, its interview process, 

or its hiring decisions. Instead, DCS contends that, as to each of the vacancies 
forming the basis of Weatherington’s suit, it hired the most qualified candidate. (See 
Doc. 19; Doc. 18-2; Doc. 18-3; Doc. 18-6; Doc. 18-7.) In response to 

Weatherington’s Equal Pay claim, DCS challenges Weatherington’s assertion that 
she was equally situated to certain named male comparators, and highlights the 
differences between the first-year probationary principal contract that she held, and 
the three-year principal contract that her alleged male comparators held. (Doc. 19, 

p. 50.) It insists Weatherington’s gender was not a consideration for determining 
which contract she was awarded or her salary. (Doc. 18-5; Doc. 19, pp. 50-53.) 
a. Weatherington’s Qualifications 
To be sure, Weatherington is a well-qualified school administrator. She boasts 
two bachelor’s degrees – one from Alabama State University and one from Troy 

University in Dothan – and obtained her master’s degree in Education Leadership in 
2009, as well as an Education Specialist degree in 2018 – both from Troy University 
in Dothan. (Doc. 18-1, pp. 54-56.) 

Weatherington’s history as a DCS employee has been long and largely 
without incident. DCS first hired her in 2003 to be a teacher (and for a short time, 
the program specialist) at PASS Academy, where she remained until 2012. (Id., pp. 
13-14.) Weatherington went on to work in several administrative positions at Dothan 

High School, where she spent one year as the ninth-grade coordinator and one year 
as assistant principal. (Id., pp. 16, 20.) She also had a short tenure as principal of 
Honeysuckle Middle School from October 2014 through December 2015 before the 

superintendent removed her from the position. (Id., pp. 19-20.) She returned to 
Dothan High as assistant principal in February 2016.1 (Id., pp. 25-26.) 
Weatherington remains employed by DCS, and most recently stepped into the 
position of principal at PASS Academy, for which she was awarded a three-year 

principal contract in the summer of 2020. (Id., p. 49.) 

1 Dothan High School became Dothan Preparatory Academy in the spring of 2019. Then-
Superintendent Dr. Edwards assigned Weatherington to an administrative position at the Dothan 
Preparatory satellite campus in February 2020. (Doc. 18-1, pp. 47-48.) 
Of course, Weatherington’s employment with DCS, though it has not lapsed, 
has not been entirely without discord. This is largely because, in December 2015, 

then-Superintendent Dr. Charles Ledbetter (“Ledbetter”) made the decision to 
remove her from her position as principal of Honeysuckle Middle School. Because 
this event is a focus of Weatherington’s claims, it is discussed in detail below. 

b. Weatherington’s Transfer from Honeysuckle Middle School 

Weatherington applied for and was interviewed to fill the vacant principal 
position at Honeysuckle Middle School in the fall of 2014. (Doc. 18-1, pp. 24-25.) 
The interviewing committee recommended Weatherington to the Board for hire, and 
DCS subsequently issued her a principal contract. (Id.) Being that it was her first 
principal contract, the contract was probationary, as is customary for all first-time 
principals. (Doc. 18-5, p. 2.) Her first day on the job was in October 2014. (Doc. 18-

1, p. 25.) 
In December 2015 – 15 months after her tenure at Honeysuckle began – 
Ledbetter called Weatherington in to meet with him. (Doc. 18-1, pp. 27-28.) It was 
at this meeting that Ledbetter informed Weatherington that he was removing her 

from her position as Honeysuckle principal, and he handed her a letter with a notice 
that she was being reassigned to PASS Academy. (Id., pp. 28-29.) According to 
Weatherington, Ledbetter explained that he wanted to go in a different direction. 
(Id.) This did not sit well with Weatherington, who apparently refused to sign the 
transfer letter and left the meeting without saying anything further. (Id.) 

After the meeting, Weatherington first contacted her representative at the 
Alabama Education Association (“AEA”), Rhonda Hicks. (Id., pp. 29-30.) Next, she 
called Franklin Jones, who was serving on the Board of Education at the time. (Id., 

pp. 29-30.) Weatherington did not lodge any formal complaints on her own behalf 
with either Ledbetter or the Board concerning her transfer from Honeysuckle, nor 
did she communicate about the transfer with anyone else other than her lawyer, Clint 
Daughtrey, who the AEA had assigned to her. (Id., pp. 39-42.) 

Weatherington’s displeasure with the transfer spurred Daughtrey to initiate a 
series of conversations with DCS, all of which took place between December 2015 
and February 2016.2 (Id., pp. 35-36.) During this time, Weatherington remained on 

leave, and did not report to work at Honeysuckle or anywhere else. (Id., pp. 36-37.) 
By February 2016, Daughtrey and DCS had negotiated a Settlement Agreement 
(“Settlement Agreement”), (Doc. 18-8), under which Weatherington would request 
a voluntary transfer to Dothan High as an assistant principal, and DCS would 

continue paying Weatherington under her probationary principal contract through its 

2 The record is conspicuously silent as to whom Daughtrey spoke with, the specifics of those 
conversations, and namely, whether anything was said about discrimination against 
Weatherington. However, DCS stresses it had no notice of Weatherington’s discrimination claims 
prior to the filing of this lawsuit, (Doc. 19, pp. 9-10), and Weatherington offers no evidence to the 
contrary. 
end date in July 2016. (Doc. 18-1, pp. 35-36; Doc. 18-8, pp. 1-2.) By its terms, the 
Settlement Agreement further specified that Weatherington would be “free to apply 

for any and all positions posed as vacant by the Board,” and that the Settlement 
Agreement itself could not “be held against her… in considering her application.” 
(Doc. 18-8, p. 2.) In July 2016, Weatherington “revert[ed]” to an eleven-month 

assistant principal contract. (Id.) 
c. Vacancies for Which Weatherington was Nonselected 
After her transfer from Honeysuckle and return to Dothan High, 
Weatherington applied for six separate job openings in the DCS system.3 (See Doc. 

1.) For each position made the basis of this suit, the Board made the final hiring 
decisions based on recommendations submitted by the superintendent and relevant 
personnel. The facts relating to each position, viewed in the light most favorable to 

Weatherington, are explained in turn. 
 i. Supervisor of Exceptional Educational Services 
In April 2016, Weatherington applied for the Supervisor of Exceptional 
Educational Services vacancy. (Doc. 18-1, pp. 112-13.) The position was based in 

the central office and entailed assisting the director of the special education 
department, overseeing the staff in the department, and monitoring legal updates 
relevant to educating students with disabilities. (Doc. 18-7, p. 1.) It was Carol 

3 All the while, she remained employed as an assistant principal at Dothan High School. 
Cunningham, a white female and the Director of Exceptional Student Services at the 
time, who interviewed Weatherington for the position and recommended hiring a 

different candidate, Alicia Hales, as the superintendent. (Id.; Doc. 18-1, pp. 117-18.) 
As it relates to Weatherington’s qualifications for the position, Weatherington 
points to her time as the designated “special ed administrator” at PASS Academy 

and Dothan High School. (Doc. 18-1, p. 114.) By contrast, Hales, a white female, 
already had direct involvement with the Exceptional Services department throughout 
her time as a school psychometrist. (Doc. 18-7; see Doc. 18-11.) Then-
superintendent Ledbetter agreed with Cunningham’s assessment that Hales was 

more qualified, and the Board hired Hales in May 2016 on his recommendation. 
(Doc. 18-4, p. 3.) 
 ii. Cloverdale Elementary Principal 

Todd Weeks was serving as the interim DCS superintendent in May 2017 
when the Board was hiring for the vacant Cloverdale Elementary principal position. 
(Doc. 18-1, pp. 64-65.) Weatherington applied for the position and was interviewed 
by Weeks, a process that was unlike her other DCS interview experiences.4 (Id., p. 

4 Regarding DCS’s interview practices, Weatherington said: “One – one time you have a 
committee of five people. The next time you have one person. The next time you have two people. 
One interview you get a list of questions. The next interview you don’t. I mean, it’s all over the 
place….” (Doc. 18-1, pp. 167-68.) For example, DCS conducted interviews for certain positions 
by committee, as it did with the Honeysuckle position. Others, including the Cloverdale position, 
were conducted by only one person. (Id., p. 66.) Specifically, Weatherington noted DCS’s failures 
to convene an interview committee and require candidate “rankings” for all positions. (Id.) 
66.) Additionally, in her deposition, and as DCS points out in its Motion, 
Weatherington took issue with the outgoing principal’s show of favoritism, which 

she believed to have clouded DCS’s judgment in hiring for this position.5 (Doc. 18-
1, pp. 77-79; Doc. 19, p. 13.) Weeks ended up recommending Christy Martin, a 
white female, to the Board for hire based on her history working at Cloverdale and 

her proven track record as part of its administration. (Doc. 18-3, pp. 1-2.) The Board 
adopted Weeks’ recommendation. 
 iii. Highlands Elementary Principal 
Weatherington applied for the Highlands Elementary Principal position in 

June 2018, but DCS did not select her for an interview. (Doc. 18-1, pp. 95, 98.) 
Based on the affidavit of Dr. Phyllis Edwards (“Edwards”), who became 
superintendent of DCS in February 2018, DCS assembled an interview committee 

for this position, and the committee then ranked candidates based on their interview 
performance. (Doc. 18-2, p. 2.) Though it is not entirely clear which applicants DCS 
interviewed for the position, at least one black female, Erica Hall, did receive an 
interview. (Doc. 18-1, p. 103; Doc. 18-3, p. 2.) 

Weatherington believes that retaliation, in addition to racial discrimination, is 
to blame for her nonselection based on her qualifications as compared to Hall, who 

5 Weatherington testified that the outgoing principal had told several Cloverdale teachers that 
“Christy [Martin] was going to get the job.” (Doc. 18-1, p. 78.) 
Weatherington believes had less administrative experience. (Doc. 18-1, p. 103.) And 
she once again questions the involvement of an outgoing principal, in this case, Vicki 

Davis, though Edwards disputes this. (Id., p. 104.) Edwards recommended 
Blakelynn Barker to the Board, and Barker was hired. (Doc. 18-2, pp. 2-3.) Barker, 
a white female, had five years of experience as a school principal and positive 

recommendations making her the most qualified applicant in Edwards’ and Weeks’ 
view. (Id.; Doc. 18-3, p. 2.) They maintain that neither race nor retaliatory motives 
played a factor in this decision. 
 iv. Federal Programs Director 

The next position for which Weatherington applied was the Federal Programs 
Director – a position based in the DCS central office. (Doc. 18-1, pp. 126-27.) She 
was given an interview, which was conducted on November 30, 2018 by a three-

member committee consisting of Lee Jacobs, a white female; Mike Manual, a white 
male; and Scott Faulk, a black male. (Id., p. 130.) The committee asked each 
candidate the same questions and, based on their answers, ranked them from best to 
worst. (Id., p. 130; see Doc. 18-12.) Jacobs presented Chris Duke, the highest-

ranking candidate, to Edwards, who then recommended Duke to the Board for hire. 
(See Doc. 18-6; Doc. 18-2, p. 3.) Of the seven interviewees, Weatherington ranked 
last. (Doc. 18-12.) 
Duke, a white male, had considerable experience developing and 
implementing federally funded programs in his former role as a Career Tech Director 

and “seemed to have a very professional manner in dealing with difficult situations.” 
(Doc. 18-6, pp. 2, 6.) The candidate pool for this position was indeed competitive. 
Weatherington herself concedes that candidate Donnie Chambers, who ranked 

second, was “very bright” and had the “same qualifications” that she had, though 
she could not speak to his performance in the interview. (Doc. 18-1, pp. 135-36.) 
Moreover, Charles Corbitt – one of the other candidates who ranked above 
Weatherington – was also black. (Doc. 19, pp. 16-17; Doc. 18-1, pp. 136-37.) 

Weatherington also admits to helping another higher-ranked white candidate, though 
she could not speak precisely to the disparity in their respective rankings. (Doc. 18-
1, pp. 136-37.) 

 v. Curriculum Director 
Weatherington applied for the Curriculum Director vacancy in early 2019. 
(Doc. 18-2, p. 3.) A committee, which consisted of Lee Jacobs, Jeff Hatfield, and 
one other unknown person, selected and interviewed the top candidates from the 

applicant pool. (Doc. 18-1, p. 146.) Edwards then personally interviewed and ranked 
the top two candidates; Weatherington was not among them. (Id.; Doc. 18-2, p. 3.) 
Ultimately, Dr. Edwards recommended Maria Johnson, a white female, to the Board 

for hire, citing her extensive experience as a principal, relationship with school 
administrators across the system, and curriculum and assessment background. (Doc. 
18-2, pp. 3-4.) Weatherington, Edwards contends, lacked the relevant experience 

and the requisite relationships with other administrators. (Id.) 
When asked whether she is alleging to have been more qualified than Johnson, 
Weatherington responded, simply, “No.” (Id., pp. 145-46.) She further confessed 

that she did not know whether Jacobs, one of the relevant hiring personnel, was privy 
to her transfer from Honeysuckle or subsequent Settlement Agreement with DCS. 
(Id., p. 147.) For her part, Jacobs asserts she does not have any knowledge of the 
“particulars” of the Settlement Agreement, nor had she been aware of any 

discrimination claims by Weatherington prior to the filing of this lawsuit. (Doc. 18-
6, p. 3.) 
 vi. Girard Intermediate Principal 

Most recently, in the summer of 2019, Weatherington applied to fill the 
principal vacancy at Girard Intermediate School.6 (Doc. 18-1, p. 161.) For this 
position, DCS again assembled a small committee, this time comprised of Maria 
Johnson and Sue Clark, to select and interview applicants. (Doc. 18-2, p. 4.) The 

committee then ranked interviewees, and Edwards recommended top performer, 

6 This lawsuit was filed on June 13, 2019, meaning that this particular cause of action arose after 
Weatherington filed her complaint. (See Doc. 1; Doc. 18-2, p. 161.) 
Sara Bouchard, a white female she considered the most qualified applicant, to the 
Board for hire. (Id.) 

In explaining this decision, Edwards pointed to Bouchard’s background with 
International Baccalaureate (“IB”) programs, which was an attractive resume line in 
light of DCS’s plan to convert Girard from a middle school to an IB elementary 

school. (Id.) She additionally noted Bouchard’s deep knowledge of budgets and 
background in curriculum development, among others. (Id.) Meanwhile, 
Weatherington charges that she, too, was well qualified for the post and had the 
relevant experience and, “[again], a white female was hired for the job.” (Id., p. 165.) 

d. Weatherington’s Salary 
As noted above, when the Board hired Weatherington to fill the principal 
position at Honeysuckle in 2014, it offered her a probationary principal contract. 

(Doc. 18-1, pp. 186-87.) Her annual salary was set at $80,659.50, effective October 
10, 2014 through June 30, 2016. (See Doc. 18-19.) 
 i. Types of Principal Contracts and Salary Considerations 
DCS relies on Dennis Coe, its Chief Operating Officer, to explain the 

particulars of its pay scale for principals and how it determines where an employee 
falls on that scale. Alabama Code § 16-24B-3, Coe notes contextually, differentiates 
between probationary principals and contract principals. (Doc. 19, pp. 21-22; Doc. 

18-5.) Where probationary principals are those employed as a principal for the first 
time, contract principals have already completed their probationary period and 
therefore have already served as a probationary principal; thus, they are afforded 

greater legal protections. See Ala. Code § 16-24B-3(a). It is at the discretion of the 
employing board to determine whether a probationary period is appropriate, and it 
may call for a probationary period to last for up to two full contract years. Id. Salary 

amounts are commonly based upon a principal’s probationary status, and higher 
salaries may be negotiated and awarded to principals – particularly contract 
principals – based on prior experience and a history of success. (Doc. 18-5, p. 3.) 
 ii. Male Comparators 

Weatherington identifies two male comparators as the basis for her Equal Pay 
Act claims. 
 1. Jeffrey Torrence 

DCS hired Jeffrey Torrence (“Torrence”) to be a principal under a 
probationary contract for a two-year term beginning on February 11, 2014 and 
ending on February 10, 2016. (See Doc. 18-13.) Under the probationary contract, his 
annual salary was set at $80,251.86. (Id., p. 2.) After completing this probationary 

period, Torrence became the principal of Honeysuckle Middle School (as 
Weatherington’s replacement) in February 2014. (Doc. 18-5, p. 3.) At this point, 
DCS offered him a three-year principal contract with an annual salary of $95,000.00. 

(Id.; Doc. 18-14, p. 2.) And when the three-year contract ended on June 30, 2019, 
DCS once again employed him under a three-year principal contract for which 
Torrence negotiated a slightly higher annual salary of $95,220.00. (Doc. 18-15, p. 

2.) Torrence remains employed by DCS, and his present contract is set to end on 
June 30, 2022. (Id., p. 1.) 
 2. Darius McKay 

Prior to his employment with DCS, Darius McKay (“McKay”) had six years 
of experience as an assistant principal and two years of experience as a principal in 
a different school system. (Doc. 18-5, p. 3.) He was hired by DCS as a probationary 
principal to fill the vacancy at Girard Middle School (now Girard Intermediate) for 

a period that would last only one year, from July 28, 2015 through June 30, 2016. 
(See Doc. 18-16.) For this time, his salary was set at $78,164.47. (Id., p. 2.) In July 
2016, DCS hired McKay to remain at Girard under a three-year principal contract at 

a salary of $92,000.00, (Doc. 18-17, p. 2), and again in July 2019 at a salary of 
$95,220.00 (Doc. 18-18, p. 2). His current contract will end on June 30, 2022. (Id., 
p. 1.) 
III. PROCEDURAL HISTORY 

a. Filing of EEOC Charge 
On September 25, 2018, Weatherington filed a charge of discrimination with 
the Equal Employment Opportunity Commission (“EEOC”). (See Doc. 18-10.) She 

identified race, retaliation, sex, and gender as the bases of her charge and claimed it 
was a continuing action with the latest act of discrimination occurring on June 30, 
2018.7 (Id.) The charge also contains a summary of Weatherington’s complaints 

about DCS’s allegedly discriminatory employment practices, including 
compensating male employees more than female employees, failing to adopt and 
implement standard hiring practices, retaliating against her due to her prior claims 

of discrimination, and hiring less qualified white applicants over more qualified 
black applicants. (Id.) No amendments were ever made to the charge. 
b. The Present Action 
Weatherington filed her Complaint, (Doc. 1), on June 13, 2019, and DCS filed 

its Answer on July 18, 2019, (Doc. 6). In her Complaint, Weatherington includes 
four counts. Counts One and Two address her race discrimination allegations as they 
relate to DCS’s failure to hire or promote her on six separate positions, dating back 

to 2016. Her claims in Count One proceed under Section 1983, and in Count Two, 
under Title VII. Notably, Weatherington clarifies that, as it pertains to Count Two, 
she bases her claims only on the following five positions: Supervisor of Exceptional 

7 On her EEOC charge, Weatherington recounts only two positions for which DCS failed to hire 
her, including the Highlands Elementary Principal and Cloverdale Elementary Principal positions. 
(Doc. 18-10.) Instead of mentioning the other positions discussed in her Complaint with any 
specificity, she vaguely references the “bias, discrimination, and favoritism” demonstrated by the 
Board’s system-wide hiring practices. (Id.) The Court notes that this omission alone does not 
preclude judicial review of factual allegations made in the Complaint; however, the Complaint is 
“limited by the scope of the EEOC investigation that can reasonably be expected to grow out of 
the charge of discrimination.” Kelly v. Dun & Bradstreet, Inc., 557 F. App’x 896, 899 (11th Cir. 
2014). 
Services, Cloverdale Elementary Principal, Highlands Elementary Principal, 
Director of Federal Programs, and Girard Intermediate Principal. Count Three also 

addresses Weatherington’s failure to hire/promote claims, which she attributes to 
retaliation under Title VII. She alleges retaliation for only five of the six positions 
discussed in the facts: Cloverdale Elementary Principal, Highlands Elementary 

Principal, Director of Federal Programs, Curriculum Director, and Girard 
Intermediate Principal. Count Four asserts a separate and distinct claim under the 
Equal Pay Act,8 which she bases upon her salary as compared to two male principals 
at DCS. 

DCS filed its Motion along with a brief and evidentiary submission in support 
of the Motion, (Doc. 18; Doc. 19), on July 13, 2020. Weatherington filed her 
response brief in opposition to DCS’s Motion, (Doc. 26), on September 25, 2020. 

DCS filed its reply brief, (Doc. 29), on October 12, 2020. 
IV. JURISDICTION 

8 Weatherington ostensibly makes a last-ditch attempt to assert an additional claim of gender 
discrimination on a failure to hire or failure to promote basis on the last page of her brief opposing 
summary judgment. (Doc. 26, p 23.) But apart from allegations of Equal Pay Act violations, the 
Complaint makes no reference to gender discrimination with respect to DCS’s failure to hire 
Weatherington into any of the vacancies discussed. Because such a claim cannot be properly 
brought at the summary judgment stage, the Court refuses to address it now. See Gilmour v. Gates, 
McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (“Liberal pleading does not require that, 
at the summary judgment stage, defendants must infer all possible claims that could arise out of 
facts set forth in the complaint.”). 
Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 as to 
Weatherington’s federal causes of action. The parties do not contest personal 

jurisdiction or venue, and there are adequate allegations to support both. See 28 
U.S.C. § 1391. 
V. STANDARD OF REVIEW 

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper “if 
the pleadings, depositions, answers to interrogatories, and admissions on file, 
together with the affidavits, if any, show that there is no genuine issue as to any 
material fact and that the moving party is entitled to judgment as a matter of law.” 

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A district court must view the 
evidence, and draw all reasonable inferences therefrom, in the light most favorable 
to the nonmoving party. See, e.g., Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 

(11th Cir. 2010); Bingham, Ltd. v. United States, 724 F.2d 921, 924 (11th Cir. 1984). 
Just as importantly, a court cannot make decisions as to the merits of properly 
disputed factual issues. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 
(1986); Ryder Int’l Corp. v. First Am. Nat’l Bank, 943 F.2d 1521, 1523 (11th Cir. 

1991). 
The party moving for summary judgment “always bears the initial 
responsibility of informing the district court of the basis for the motion.” Celotex, 

477 U.S. at 323 (1986); see, e.g., Weinberger v. Hynson, Westcott & Dunning, 412 
U.S. 609, 622 n.18 (1973). A party asserting that a fact cannot be or is genuinely 
disputed can support such a statement by citing to particular parts of materials in the 

record, including depositions, documents, electronically stored information, 
affidavits or declarations, stipulations (including those made for purposes of the 
motion only), admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 

56(c)(1)(A); Celotex, 477 U.S. at 323, 325. Alternatively, the movant can do one of 
two things. It can contend that the materials cited do not establish the absence or 
presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1)(B); Fuller v. SL Alabama, 
LLC, 56 F. Supp. 3d 1232, 1236 (M.D. Ala. 2014). Or, if it will not bear the burden 

of production at trial, it can assert, without citing the record, that the nonmoving 
party “cannot produce admissible evidence to support” a material fact. Fed. R. Civ. 
P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 advisory committee’s note to 1963 

amendment (“Subdivision (c)(1)(B) recognizes that a party need not always point to 
specific record materials.... [A] party who does not have the trial burden of 
production may rely on a showing that a party who does have the trial burden cannot 
produce admissible evidence to carry its burden as to the fact.”). 

If the movant meets its burden, the burden shifts to the nonmoving party to 
establish—with evidence beyond the pleadings—that a genuine dispute material to 
each of its claims for relief exists. See, e.g., Celotex Corp., 477 U.S. at 324; 

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The 
nonmoving party is required “to go beyond the pleadings” and to present competent 
evidence designating “specific facts showing that there is a genuine issue for trial.” 

Celotex, 477 U.S. at 324. Generally, “[t]he mere existence of a scintilla of evidence” 
supporting the nonmoving party’s case is insufficient to defeat a motion for summary 
judgment. Anderson, 477 U.S. at 252. 

In applying Rule 56, a court must heed two definitions. Applicable substantive 
law identifies those facts that are material and those that are irrelevant. Id. at 248. 
As a matter of course, “[d]isputed facts that do not resolve or affect the outcome of 
a suit will not properly preclude the entry of summary judgment.” Kingsley v. 

Tellworks Commc'ns., LLC, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at 
*14 (N.D. Ga. May 24, 2017). Meanwhile, an issue is not genuine if it is unsupported 
by evidence, or if it is created by evidence that is “merely colorable” or is “not 

significantly probative.” Anderson, 77 U.S. at 250. Essentially, a genuine dispute of 
material fact exists when the nonmoving party produces evidence allowing a 
reasonable fact finder to return a verdict in its favor. See Waddell v. Valley Forge 
Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). 

VI. DISCUSSION 
a. Claims and Limitations Periods 
Before addressing the merits of Weatherington’s claims, the Court must 

address DCS’s preliminary contentions that one of Weatherington’s race 
discrimination claims brought under Section 1983 is time-barred, and additionally 
that four of the race discrimination and four of the retaliation claims brought under 

Title VII should be dismissed for Weatherington’s failure to exhaust her 
administrative remedies. 
 i. Weatherington’s Time-Barred Claim 

“All constitutional claims brought under Section 1983 are tort actions, subject 
to the statute of limitations governing personal injury actions in the state where the 
Section 1983 action has been brought.” McNair v. Allen, 515 F.3d 1168, 1173 (11th 
Cir. 2008); see 42 U.S.C. § 1988(a). In Alabama – the forum state in which 

Weatherington has raised her claims – the governing limitations period is two years. 
Ala. Code § 6-2-38(l); Lufkin v. McCallum, 956 F.2d 1104, 1106 n. 2 (11th Cir. 
1992). Accordingly, she was required to bring her claims within two years from the 

date the limitations period began to run. 
The Eleventh Circuit has long held that “the statute of limitations does not 
begin to run until the facts which would support a cause of action are apparent or 
should be apparent to a person with a reasonably prudent regard for [their] rights.” 

Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir.1987). It bears iterating that 
an alleged series of discrete decisions not to hire or promote do not constitute a 
continuing violation for statute of limitations purposes in actions brought pursuant 

to Section 1983. See, e.g., Smith v. Alabama Dep’t of Corr., 131 F. Supp. 2d 1318, 
1321 (M.D. Ala. 2001); E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 
(11th Cir. 2002) (holding that each instance of failing to hire is a discrete act that 

cannot constitute a continuing violation). Thus, each instance where DCS failed to 
hire Weatherington gave rise to a separate cause of action. 
The two-year statute of limitations period bars the Section 1983 race 

discrimination claims that Weatherington bases upon DCS’s failure to award the 
position of Supervisor of Exceptional Services to her. Because DCS awarded the 
position to Alicia Hales in May 2016, Weatherington should have filed suit prior to 
the expiration of the limitations period in May 2018. She did not do so. Therefore, 

DCS’s motion for summary judgment is due to be granted as to this time-barred 
employment decision. Weatherington’s remaining Section 1983 claims are timely 
and therefore are evaluated on the merits below. 

 ii. Failure to Exhaust Administrative Remedies 
 1. Timely EEOC Charge Requirement 
DCS’s second preliminary contention is that Weatherington failed to exhaust 
her administrative remedies as required by Title VII. More specifically, DCS claims 

Weatherington failed to timely file EEOC charges with respect to the racially 
discriminatory selection of the following positions: Supervisor of Exceptional 
Services, Cloverdale Elementary Principal, Director of Federal Programs, and 

Girard Intermediate Principal. (Doc. 19, pp. 27-28.) It further claims she failed to 
timely file EEOC charges as to the retaliatory nonselection of her for the following 
positions: Cloverdale Elementary Principal, Director of Federal Programs, 

Curriculum Director, and Girard Intermediate Principal. (Id.) By process of 
elimination, the only Title VII claims Weatherington has preserved, DCS argues, are 
those that relate to the Highlands Elementary Principal position. 

As a condition precedent to filing a Title VII suit in federal court, a plaintiff 
must first exhaust her administrative remedies by filing a charge with the EEOC. See 
Forehand v. Fla. State Hosp. at Chattahoochee, 89 F.3d 1562, 1567 (11th Cir. 
1996); 42 U.S.C. § 2000e-5(e)(1). In this Circuit, specifically, a plaintiff is limited 

to filing his or her charge within 180 days after the alleged unlawful employment 
practice occurred, and failure to do so “generally results in a bar of the claims 
contained in the untimely charge.” Id.; Reed v. Winn Dixie, Inc., 677 F. App’x 607, 

610 (11th Cir. 2017) (citing Alexander v. Fulton Cty., Ga., 207 F.3d 1303, 1332 
(11th Cir. 2000)). 
Once a plaintiff has filed an EEOC charge, she must amend it to include any 
new discrete acts of employment discrimination that occur. See Kelly v. Dun & 

Bradstreet, Inc., 557 F. App’x 896, 899 (11th Cir. 2014). Where allegations of 
employment discrimination have not been administratively considered, a judicial 
finding of discriminatory conduct is not proper. Id. Failures to promote or hire are 

discrete acts that must be amended into an existing charge, or filed as a new charge, 
in order to be actionable. See Duble v. FedEx Ground Package Sys., Inc., 572 F. 
App’x 889, 893 (11th Cir. 2014) (holding that after a new discrete act, plaintiff must 

amend his EEOC charge for it to be actionable); Riccard v. Prudential Ins. Co., 307 
F.3d 1277, 1291 (11th Cir. 2002)(citing E.E.O.C v. Joe’s Stone Crabs, Inc. for the 
proposition that failure to hire incidents are discrete events that do not constitute a 

continuing violation). 
In the instant case, Weatherington did not file an EEOC charge until 
September 25, 2018. (See Doc. 18-10.) By failing to file earlier, she failed to preserve 
any Title VII claim that accrued prior to March 24, 2018. For ease of reference, each 

of her Title VII claims accrued at the following times: 
 Supervisor of Exceptional Services April 2016 
 Cloverdale Elementary Principal July 2017 
 Highlands Elementary Principal September 2018 
 Federal Programs Director December 2018 
 Curriculum Director March 2019 
 Girard Intermediate Principal July 2019 

By this measure, Weatherington did not comply with the 180-day deadline 
applicable to either the Supervisor of Exceptional Services or Cloverdale Elementary 
positions, which occurred more than 29 months and 14 months, respectively, before 
she filed her EEOC charge. Likewise, she failed to amend her EEOC charge to 
reflect the alleged discriminatory conduct that accrued subsequent to her initial 
filing, namely that conduct related to the Federal Programs Director position, 
Curriculum Director position, and Girard Intermediate Principal position, and she 
further did not file any additional EEOC charges in her allotted 180-day timeframe. 

Weatherington’s failure to exhaust provides an independently sufficient basis 
to grant summary judgment in DCS’s favor on most of Weatherington’s Title VII 
claims, the only exception being her race discrimination and retaliation claims linked 

to the Highlands Elementary position. The Court will accordingly address claims 
related to the Highlands Elementary position on the merits. 
 2. Continuing Violation Doctrine 
Weatherington contends that the discrimination of which she complains is a 

“continuing action” and therefore her failure to file an EEOC charge within 180 days 
of each separate incident of alleged employment discrimination is legally excused. 
To support this, she cites Anderson v. Embarq/Spring, 379 F. App’x 924, 926 (11th 

Cir. 2010), in which the Eleventh Circuit explained that a plaintiff’s complaint is 
“limited by the scope of the EEOC investigation which can reasonably be expected 
to grow out of the charge of discrimination.” (Doc. 26, p. 13.) The Anderson court 
continued, holding that new claims “are allowed if they amplify, clarify, or more 

clearly focus the allegations of the EEOC complaint.” Id. (citations omitted). 
Without applying any of the relevant facts to the stated law, Weatherington leaves 
this Court to presume that her opposition to summary judgment on exhaustion 
grounds turns on the continuing violation doctrine, which would not apply in the 
instant case even if it had been correctly alleged. 

When the continuing violation doctrine does apply, it allows an employee who 
has filed a timely EEOC charge to bring claims for previous acts of discrimination 
which would otherwise be time-barred. See Roberts v. Gadsden Mem’l Hosp., 835 

F.2d 793, 800 (11th Cir.), opinion amended on reh’g, 850 F.2d 1549 (11th Cir. 
1988). In determining whether a violation is truly “continuing,” the Eleventh Circuit 
distinguishes “between the present consequence of a one-time violation, which does 
not extend the limitations period, and the continuation of that violation into the 

present, which does.” Calloway v. Partners Nat. Health Plans, 986 F.2d 446, 448 
(11th Cir. 1993). 
The continuing violation doctrine “does not exist to give a second chance to 

an employee who allowed a legitimate Title VII claim to lapse.” Id. Yet, that is 
exactly what Weatherington is attempting to do. But instead of demonstrating that 
the consequences of the alleged discriminatory conduct have extended into the 
present, Weatherington has demonstrated only that her injury following each alleged 

act of discrimination was the same: she was not awarded the job. This is not enough. 
Commonality of injury does not suggest that each discrete violation was itself 
continuing. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977). 
Each decision not to hire or promote Weatherington was permanent and had 
an immediate consequence sufficient to put her on notice that a cause of action had 

accrued. In following well-settled precedent, this Court now finds the continuing 
violation doctrine cannot apply in the instant case, and that each failure to promote 
or hire Weatherington stands as its own discrete cause of action. See, e.g., Stuart v. 

Jefferson Cty. Dep’t of Human Res., 152 F. App’x 798, 801 (11th Cir. 2005) (holding 
employee’s failure to promote claim not included in his EEOC charge was 
procedurally barred because it did not grow out of previous failure to promote 
claims); Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (“Discrete 

acts such as … failure to promote … or refusal to hire are easy to identify…. Each 
incident of discrimination and each retaliatory adverse employment decision 
constitutes a separate actionable ‘unlawful employment practice.’”). 

b. Race Discrimination 
The Court now turns to the merits of Weatherington’s remaining claims, 
beginning with her race discrimination claims. When she filed her complaint, she 
alleged race discrimination, under Section 1983 and Title VII, against the Board for 

its failure to hire or promote her into the following five positions9: Supervisor of 

9 In her deposition, Weatherington clarified that she is not alleging race discrimination as it 
concerns DCS’s failure to hire her to fill the Curriculum Director vacancy. (Doc. 18-1, p. 146.) 
Exceptional Services10, Principal of Cloverdale Elementary School, Principal of 
Highlands Elementary School, Director of Federal Programs, and Principal of Girard 

Intermediate School. Based upon the statute of limitations pertinent to her Section 
1983 claims and the Title VII exhaustion requirement, not all of these claims warrant 
the Court’s analysis. Weatherington’s only remaining Section 1983 claim (Count I) 

relates to the Principal of Cloverdale Elementary School, Principal of Highlands 
Elementary School, Director of Federal Programs, and Principal of Girard 
Intermediate School positions; pursuant to Title VII (Count II), her only actionable 
claim relates to the Highlands Elementary School position. 

The Fourteenth Amendment’s Equal Protection Clause prohibits intentional 
race discrimination in public employment. Bush v. Houston Cty. Comm’n, 414 F. 
App’x 264, 266 (11th Cir. 2011). Section 1983, which prohibits the deprivation of a 

federal right by a “person acting under color of state law,” provides a cause of action 
for a Fourteenth Amendment violation. 42 U.S.C. § 1983; see Albright v. Oliver, 510 
U.S. 266, 271 (1994) (noting Section 1983 provides a method for vindicating 
infringement of constitutional rights). Title VII similarly prohibits employers from 

refusing to hire any individual, or otherwise discriminating against any individual, 
“because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. 

10 All claims linked to the Supervisor of Exceptional Services position have been barred entirely. 
The statute of limitations already has run on her Section 1983 claim for that position, and her Title 
VII claim is barred by Weatherington’s failure to exhaust her administrative remedies. 
§ 2000e-2(a)(1). Because the legal elements for Section 1983 and Title VII are 
identical, the Court will analyze the claims under both pertinent laws concurrently. 

See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (noting that, in the 
employment context, race discrimination claims under Title VII and Section 1983 
have the same legal elements); Bush, 414 F. App’x at 266 (same). 

 i. Burden-Shifting Legal Framework 
Disparate treatment claims, such as Weatherington’s, require proof of 
discriminatory intent, whether by direct or circumstantial evidence. See Schoenfeld 
v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999); Carmichael v. Birmingham Saw 

Works, 738 F.2d 1126, 1131 (11th Cir. 1984). Direct evidence proves a fact without 
inference or presumption and generally takes “the form of actions or remarks of the 
employer reflecting a discriminatory attitude.” Hill v. Metro. Atlanta Rapid Transit 

Auth., 841 F.2d 1533, 1539 (11th Cir. 1988). 
Absent such evidence, a plaintiff may prove its case through circumstantial 
evidence by relying on the analytical framework established in McDonnell Douglas 
Corp. v. Green, 411 U.S. 792 (1973). Both parties acknowledge that 

Weatherington’s race discrimination claims are premised solely on circumstantial 
evidence, (Doc. 19, p. 30; Doc. 26, pp. 9-10), and are thus subject to the three-step 
burden-shifting framework set forth in McDonnell Douglas. 
Under this indirect methodology, the plaintiff carries the “initial burden … of 
establishing a prima facie case of racial discrimination.” McDonnell Douglas Corp., 

411 U.S. at 802. To make out a prima facie case of racial discrimination in a failure 
to hire context, and thus raise an inference of discriminatory intent, a plaintiff must 
show that: (1) she belongs to a protected class; (2) she applied and was qualified to 

fill a position for which the employer was accepting applications; (3) despite her 
qualifications, she was not hired; and (4) someone outside the protected class who 
was not better qualified was hired instead. See Brown v. Alabama Dept. of Transp., 
597 F.3d 1160, 1174 (11th Cir. 2010). The comparators for the fourth prong must be 

“similarly situated in all material respects.” Lewis v. City of Union City, 918 F.3d 
1213, 1218 (11th Cir. 2019) (en banc). 
By meeting her prima facie burden, a plaintiff creates a “rebuttable 

presumption” that her employer engaged in unlawful discrimination. E.E.O.C. v. 
Joe’s Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002) (citations omitted). 
The burden then shifts to her employer to rebut this presumption, which it can do 
with evidence that its conduct was taken for some legitimate, non-discriminatory 

purpose. Id. at 1273 (citations omitted). 
Finally, if the employer successfully meets its burden of production, the 
plaintiff “has the opportunity to demonstrate that the defendant’s articulated reason 

for the adverse employment action is a mere pretext for discrimination.” Joe’s Stone 
Crabs, Inc., 296 F.3d at 1272. A reason is not pretext without a showing that the 
reason was false and that the real reason was, in fact, discrimination. See Milledge 

v. Rayonier, Inc., 192 F. App’x 863, 865 (11th Cir. 2006). Examples of what would 
satisfy the pretext prong include a showing that an employer’s proffered legitimate 
reason had no basis in fact, that it did not actually motivate the employment decision, 

or that it would have been insufficient, on its own, to do so. Walker v. NationsBank 
of Fla. N.A., 53 F.3d 1548, 1564 (11th Cir. 1995). And in a failure to promote or hire 
context, courts could look to “weaknesses, implausibilities, inconsistencies, 
incoherencies or contradictions” in the proffered legitimate reasons that would 

support a factfinder’s inference that they were “unworthy of credence.” Springer v. 
Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1348 (11th Cir. 2007). 
“Although the immediate burdens of production shift back and forth, the 

ultimate burden of persuading the trier of fact that the employer intentionally 
discriminated against the employee remains at all times with the plaintiff.” Id. (citing 
Texas Dep’t of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)). 
For the purpose of its motion for summary judgment, DCS concedes that, as 

to each unlawful employment decision alleged, (1) Weatherington was a member of 
a racial minority; (2) she applied for and was qualified for each job; and (3) she was 
not hired to perform the jobs made the basis of her claims. However, the fourth 

element is deeply disputed. For its part, DCS argues that Weatherington cannot 
establish a prima facie case, nor can she present any evidence of pretext, because 
she cannot show that she was equally or more qualified than each successful 

candidate or that DCS otherwise acted discriminatorily. (Doc. 19, p. 31.) DCS 
maintains that it hired the most qualified candidate for each vacant position, thereby 
precluding any showing of discriminatory motive. Weatherington’s brief, which is 

little more than a recitation of the relevant law, does little to challenge DCS’s 
argument or the evidence that it presents, but the Court nevertheless addresses 
whether, based on the record evidence, Weatherington has met her burden for her 
remaining disparate treatment claims. As explained, she has not, and therefore DCS 

is due summary judgment. 
 1. Weatherington’s Prima Facie Case 
DCS principally argues that Weatherington has not proffered adequate 

comparators who received any advantage in the hiring process or were less or equally 
qualified as compared to Weatherington. The Court agrees. 
Weatherington’s failure to satisfy her prima facie burden hinges on the 
“similarly situated” language in the fourth prong, which the Eleventh Circuit 

recently clarified in its decision in Lewis v. City of Union City. In Lewis, the Eleventh 
Circuit rejected the district court’s attempt to defer a comparative qualification 
analysis to the pretext inquiry and held that this analysis remains part of the initial 

prima facie stage of the McDonnell Douglas framework. Lewis, 918 F.3d at 1218. 
The result is that, at this stage, the plaintiff must identify a comparator to whom she 
was similarly situated in “all material respects.” Id. at 1220-21; but see Vessels v. 

Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005) (subjective assessments 
of the candidates play no part in analyzing plaintiff’s prima facie case and rather, 
should be evaluated in turn as part of the employer’s burden to produce a race-neutral 

basis for its hiring decision and as part of the court’s pretext inquiry); Alvarez v. 
Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (“Because 
[plaintiff’s] job performance is bound up in the inquiry into whether [defendant’s] 
proffered reason for firing her was a pretext for discrimination, we will consider it 

at the pretext stage of the analysis.”). 
A proper comparator ordinarily will have engaged in the same basic conduct 
(or misconduct) as the plaintiff, been subject to the same employment policies and 

rules as the plaintiff, and may have reported to the same supervisor as the plaintiff. 
Lewis, 918 F.3d at 1227-28. Ultimately, “[i]f a plaintiff fails to show the existence 
of a similarly situated employee, summary judgment is appropriate where no other 
evidence of discrimination is present.” Holifield v. Reno, 115 F.3d 1555, 1562 (11th 

Cir. 1997). The Court assesses Weatherington’s proffered comparators position-by-
position. 
 a. Cloverdale Elementary Principal 
For the Cloverdale position, Weatherington identifies Christy Martin as her 
comparator. Martin, a white female, was the successful candidate for the Cloverdale 

principal position. And despite her prior experience as an administrator at 
Cloverdale, Martin had never been a school principal. Still, Weatherington has not 
shown that she was similarly situated to Martin in all material respects and cannot 

prevail on the claim that Edwards’ recommendation and the Board’s subsequent 
approval was unlawful. 11 
Most significantly, Martin and Weatherington do not share a similar history 
regarding successful completion of their roles in the DCS system. Weatherington 

disputes Martin’s comparative qualifications based on Weatherington’s tenure as 
Honeysuckle principal – a role she believes should have distinguished her from other 
candidates. But as the DCS highlights, this overlooks Weatherington’s inability to 

successfully carry out the role of principal because Weatherington was removed 
from that position. (Doc. 19, p. 37.) DCS instead suggests that when it hired Martin 
at the recommendation of interim-Superintendent Weeks, it took note of her prior 
experience and “proven track record” within the Cloverdale school’s administration. 

11 The “cat’s paw” theory of liability permits the discriminatory animus of a non-decisionmaker to 
be imputed to a neutral decision maker – or DCS, as Weatherington alleges in this case – that acted 
as a mere conduit. Crawford v. Carroll, 529 F.3d 961, 979 n. 21 (11th Cir. 2008). For example, if 
there was any evidence of discriminatory animus tied to any of the superintendent’s hiring 
recommendations, then the Board’s “rubber stamp” on that recommendation would subject DCS 
to liability for race discrimination. 
Additionally, DCS notes that Weatherington had no previous experience 
working in either an administrative or teaching capacity at an elementary school. 

(Doc. 18-3, pp. 1-2.) Martin, by contrast, was already an elementary administrator 
at Cloverdale and had preexisting relationships with parents and students at the 
school. 

These differences, which DCS duly considered when it hired Martin, (id.), 
show that Weatherington and Martin are not similarly situated in all material 
respects. See Brown v. Synovus Fin. Corp., 783 F. App’x 932, 930 (11th Cir. 2019) 
(“None of [the plaintiff’s] colleagues constitute comparators because they occupied 

different positions, had different certifications, or worked for different supervisors 
than [the plaintiff].”). 
 b. Highlands Elementary Principal12 

Like above, Weatherington has fatally proffered no adequate comparators in 
conjunction with the Highlands principal position. She does, however, proffer two 
inadequate comparators: Brooklyn Barker, a white female and the successful 
candidate; and Erica Hall, a black female who was awarded an interview but not 

hired to fill the post. Both comparators were selected for an interview; 
Weatherington was not. 

12 This is the only position for which Weatherington’s Section 1983 and Title VII race 
discrimination claims both remain. 
As for Barker, Weatherington cannot successfully put her approximate year-
long failed tenure as a principal up against Barker’s five years of experience doing 

the same. That Barker received a positive recommendation sets her candidacy further 
apart. There is no evidence that persuades the Court that it can put the distinct 
employment histories of Barker and Weatherington side by side, particularly with 

the consideration that Barker gained her prior experience in an elementary school. 
(Doc. 18-2, p. 3.) The two were simply not similarly situated in all material respects. 
See Mathis v. Wachovia Bank, 255 F. App’x 425, 431 (11th Cir. 2007) (a relevant 
difference in experience precludes finding that comparators were similarly situated). 

Next, the Court notes that Hall, who was selected to interview, was also a 
black female, and this similarity in race certainly cuts against Weatherington’s 
allegations of race discrimination. Hall, by definition, cannot be a comparator. She 

is a black female like Weatherington and thus a member of the same protected class, 
meaning that any disparities in treatment between the two is necessarily attributable 
to some factor other than race. See, e.g., Herron-Williams v. Alabama State Univ., 
287 F. Supp. 3d 1299, 1314 (M.D. Ala. 2018), aff’d, 805 F. App’x 622 (11th Cir. 

2020) (comparator cannot be a member of the same protected class). 
 c. Director of Federal Programs 
Chris Duke, a white male who was hired for the Federal Programs position, is 

yet another unsuitable comparator for Weatherington. Jacobs, who was among those 
individuals on the hiring committee for the position, documented the committee’s 
recommendation to hire Duke as based upon his considerable experience developing 

and implementing federally funded programs. (Doc. 18-6, p. 5.) She also cited to 
Duke’s exemplary interview performance, for which he ranked first out of seven 
interviewees. Meanwhile, Weatherington has presented no evidence to this Court 

highlighting that she had any experience managing large budgets that would have 
better equipped her for the job, and she ranked seventh after interview scores were 
tallied. (Doc. 18-12.) Under the facts before the Court, there is no indication that 
Weatherington and Duke were similar based in greater part on the chasm created by 

their dissimilar employment histories. See Synovus Fin. Corp., 783 F. App’x at 930. 
In her deposition, Weatherington testified that DCS also refused to hire the 
undisputedly bright Donnie Chambers for the job. Chambers is a white male who 

Weatherington believes shared the “same qualifications” as her. (Doc. 18-1, p. 135.) 
He was ranked second after his interview. But the record is devoid of any further 
information about Chambers’ credentials, and the Court does not have enough 
information to conclude he was similarly situated to Weatherington. See Herron-

Williams, 287 F. Supp. 3d at 1313 (refusing to acknowledge an unnamed comparator 
was similarly situated without further evidence vis-à-vis demographics or 
credentials). The same can be said for Charles Corbitt, a black male who was ranked 
sixth after his interview, though the fact that Corbitt was treated more favorably than 
Weatherington despite his race does little to advance her disparate treatment claim. 

 d. Curriculum Director 
Next, Weatherington avers that her rejection from the Curriculum Director 
position at DCS’s central office was racially discriminatory and attempts to meet her 

prima facie burden by identifying Maria Johnson as a comparator. Again, this 
comparator is inadequate. When asked whether she is alleging to have been more 
qualified than Johnson, Weatherington responded, simply, “No.” (Doc. 18-1, pp. 
145-46.) This concession is weighty. When compounded with a consideration of 

Johnson’s objective qualifications, including prior extensive experience as a 
principal, system-wide relationships with administrators, and an extremely pertinent 
curriculum background, there is simply no evidence that Johnson and Weatherington 

were similarly situated. See, e.g., Felder v. Bradford Health Servs., 493 F. App’x 
17, 20 (11th Cir. 2012) (two alleged comparators with different experiences, 
credentials, job duties, and qualifications were not similarly situated). 
 e. Girard Intermediate Principal 

The hiring of Sara Bouchard as Principal at Girard Intermediate School is the 
basis for Weatherington’s final race discrimination claim and is yet another for 
which this Court cannot discern a sufficiently situated comparator. Bouchard 

boasted a unique background working with the International Baccalaureate (“IB”) 
curriculum, which in and of itself distinguishes her candidacy from Weatherington’s 
candidacy and uniquely prepared her for an administrative role at a school that was 

transitioning to an IB curriculum. Weatherington, whose experience was primarily 
in secondary education administration at PASS Academy and Dothan High, and who 
had no IB experience, was not similarly situated to Bouchard. 

 2. Race-Neutral Reasons for Hiring Decisions and Pretext 
Even if the Court were to accept Weatherington’s comparator theories, it 
cannot conclude she has established an Equal Protection claim based on her 
nonselection to the positions identified in the Complaint. Put simply, there is no 

evidence before the Court that DCS engaged in discrimination on the basis of race. 
And for its part, DCS readily meets its “exceedingly light” shifted burden by 
presenting several race-neutral reasons for hiring the other candidates. See Tipton v. 

Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1495 (11th Cir. 1989). 
Moreover, DCS demonstrates a concerted effort to credibly corroborate its 
race-neutral reasons. As DCS personnel including Edwards, Weeks, Ledbetter, 
Jacobs and Cunningham detail in their respective affidavits, DCS hired on a 

position-specific basis and considered a number of hard and soft factors. For the 
positions from which Weatherington was rejected, these factors included each 
candidate’s interview performance, references, prior experience, curriculum and 

assessment background, leadership qualities, relationships with other administrators 
and school community, and track record. (See Doc. 18-2; Doc. 18-3, p. 2; Doc. 18-
4, p. 3.) That these affidavits articulate these reasons with consistency and specificity 

to each position, despite the number of varying personnel involved with each hiring 
decision, bolsters their trustworthiness. 
And a final note on DCS’s stated reasons: the fact that they are largely 

subjective does not undercut their veracity. See Denny v. City of Albany, 247 F.3d 
1172, 1186 (11th Cir. 2001) (“Personal qualities … factor heavily into employment 
decisions concerning supervisory or professional positions. Traits such as common 
sense, good judgment, originality, ambition, loyalty, and tact often must be assessed 

primarily in a subjective fashion, yet they are essential to an individual’s success in 
a supervisory or professional position.”) (citations and quotations omitted); Vessels, 
408 F.3d at 771 (employer may rely on subjective evaluations in hiring, so long as 

they are non-discriminatory, clear, and reasonably specific). DCS thus returns the 
burden to Weatherington for a showing of pretext. 
 3. Evidence of Pretext 
All told, Weatherington has failed to present any evidence of pretext that 

exposes DCS’s hiring practices as “unworthy of credence.” At best, Weatherington 
has offered conclusory allegations that for every job she applied to fill, she was 
equally or more qualified than the more successful candidate. True, she had served 

as a principal for fourteen months and had worked as a school administrator in 
several DCS schools. But her self-professed credentials are not near sufficient to call 
into question whether the Board’s reasons for hiring other candidates were mere 

pretext to conceal racial bias. See Mayfield v. Patterson Pump Co., 101 F.3d 1371, 
1376 (11th Cir. 1996); Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000) 
(plaintiff must do more than show that she was better qualified to prove pretext and 

further recognizing employer’s considerable discretion in hiring so long as criteria 
is not unlawful). 
Rather, a plaintiff “must show that the disparities between the successful 
applicant’s and [her] own qualifications were ‘of such weight and significance that 

no reasonable person, in the exercise of impartial judgment, could have chosen the 
candidate selected over the plaintiff.’” Barber v. Cellco P’ship, 808 F. App’x 929, 
936 (11th Cir. 2020) (citing Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004)). 

Objectively speaking, and from what little is known about each individual’s 
respective qualifications, Weatherington was equipped for the respective 
administrative positions; but she was not as equipped as Martin, Barker, Duke, 
Johnson, or Bouchard, to name a few. 

Under the facts presented, DCS would have had no choice but to rely on its 
own subjective assessments of each candidate’s application and interview. And here, 
even subjecting DCS’s proffered reasons to close scrutiny, the Court can detect no 

basis for the claim that unlawful discrimination was at play. Here, the Court is 
reminded of the difficulty that comes with proving a negative. But under this 
schematic, the onus rests on the plaintiff to support his or her claims. Weatherington 

has fatally neglected to highlight any contradictions, inconsistencies, or 
implausibilities in DCS’s proffered reasons, and even damningly conceded that she 
“[doesn’t] have any evidence.” (Doc. 18-1, pp. 136-37.) 

Further, where subjective factors drove a decision, it is not the Court’s duty 
to “sit in judgment of the wisdom of an employer’s selection.” Cooper, 390 F.3d at 
732; Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001). In the 
Court’s view, it was reasonable for DCS to base its hiring choices upon Martin’s 

preexisting relationships with her school community; Barker’s five-years of 
experience as a principal; Duke’s familiarity with federal funding; Johnson’s 
extensive history with DCS; and Bouchard’s IB background. 

Tangentially, Weatherington also makes a vague argument that the apparent 
“pre-selection” of Martin at Cloverdale Elementary denotes pretext. (Doc. 26, p. 16.) 
She testified that the outgoing principal at Cloverdale had told several Cloverdale 
teachers that “Christy [Martin] was going to get the job,” (Doc. 18-1, p. 78), a 

statement she believes constituted a blatant show of favoritism that disregarded the 
proper hiring procedures. But this belief ignores that it is the Court’s duty to apply 
the law, not corporate policy. Simply because “preselection violates corporate 

personnel policies… does not necessarily indicate racial discrimination.” Springer, 
509 F.3d at 1350; see also Jenkins v. Nat’l Waterworks, Inc., 502 F. App’x 830, 833 
(11th Cir. 2012). 

Even if the outgoing Cloverdale principal’s preference for Martin had been 
improper, which is not supported by the record, there is no indication that the 
preference motivated the employment decision or would have been sufficient to do 

so. The Court cannot read the principal’s isolated statement as discriminatory intent. 
Accordingly, Weatherington has failed to fulfill her shifted burden under McDonnell 
Douglas and the Court grants summary judgment in the Board’s favor on this claim. 
 ii. Convincing Mosaic 

Alternatively, Weatherington cannot advance her claims under a “convincing 
mosaic” analysis. The Eleventh Circuit has made it clear that “establishing the 
elements of the McDonnell Douglas framework is not, and never was intended to 

be, the sine qua non for a plaintiff to survive a summary judgment motion in an 
employment discrimination case.” Lockheed-Martin Corp., 644 F.3d 1321, 1328 
(11th Cir. 2011). Rather, the plaintiff will survive summary judgment if she can 
present a “convincing mosaic” of circumstantial evidence that would permit a jury 

finding of intentional discrimination. Lewis, 918 F.3d at 1221. Weatherington and 
DCS have given no indication that they intend to proceed under the convincing 
mosaic standard, but out of an abundance of caution, the Court addresses it now. 
A plaintiff can show a convincing mosaic with “evidence that demonstrates, 
among other things, (1) ‘suspicious timing, ambiguous statements..., and other bits 

and pieces from which an inference of discriminatory intent might be drawn,’ 
(2) systematically better treatment of similarly situated employees, and (3) that the 
employer’s justification is pretextual.” Lewis, 934 F.3d at 1185 (quoting Silverman 

v. Bd. of Educ. of City of Chi., 637 F.3d 729, 733–34 (7th Cir. 2011)). 
Weatherington’s evidence is scarce and when considered cumulatively 
certainly does not rise to the level of a reasonable inference of discrimination. In 
support of her claims of discrimination, Weatherington points to DCS’s dearth of 

uniform hiring procedures, (Doc. 26, p. 18), a newspaper article in which an 
individual expressed frustration with DCS’s failure to prioritize diversity in hiring, 
(Doc. 26-1), alleged favoritism shown by the outgoing principals (all of their races 

unknown) at Cloverdale and Highlands, (Doc. 26, p. 16), and her own observation 
that DCS had hired a principal with no prior experience in elementary school 
administration at another elementary school in the district, (id.). Most of all, she 
condemns DCS’s “invisible suspicious hand” that denied her jobs in favor of white 

candidates on the five separate occasions now at issue. (Doc. 26, p. 18.) 
Weatherington also questions DCS’s reliance on subjective criteria in hiring – so 
subjective, she suggests, that they must create a triable issue of fact. (Doc. 26, p. 18.) 
Viewed in the light most favorable to Weatherington, it is not difficult to see 
that she may feel personally slighted by DCS’s intermittent rejection. But DCS was 

never under an imperative to hire Weatherington; its legal imperative was to refrain 
from discriminatory conduct. The Court cannot reasonably infer racial animus from 
the fact that DCS hired five white women and one white man to fill the positions 

that Weatherington targets in this lawsuit, especially given the evidence that DCS 
employed other black principals like Jeffrey Torrence and Darius McKay, (see Doc. 
18-5), and treated other black candidates like Erica Hall and Charles Corbitt more 
favorably than Weatherington, (Doc. 18-3, p. 2; Doc. 18-1, pp. 136-37). 

Weatherington’s claims under the convincing mosaic standard fare no better 
than under the burden-shifting framework, and her incomplete mosaic cannot 
support a reasonable inference of discrimination. The Court confirms its conclusions 

that DCS is due summary judgment on Weatherington’s race discrimination claims. 
c. Retaliation 
Title VII of the Civil Rights Act of 1964 forbids an employer from retaliating 
against an employee because of the employee’s opposition to “any practice made an 

unlawful practice” by Title VII, or the employee’s participation in “an investigation, 
proceeding, or hearing under [Title VII].” 42 U.S.C. § 2000e-3(a). As with the 
substantive race discrimination inquiry, the McDonnell Douglas burden-shifting 
analysis also applies to retaliation claims relying on circumstantial evidence, such 
as this one. 

“A prima facie case of retaliation under Title VII requires the plaintiff to show 
that: (1) she engaged in an activity protected under Title VII; (2) she suffered an 
adverse employment action; and (3) there was a causal connection between the 

protected activity and the adverse employment action.” Crawford v. Carroll, 529 
F.3d 961, 970 (11th Cir. 2008). An employee who makes out a prima facie case 
creates a presumption that the adverse action was the product of an intent to retaliate. 
If a plaintiff establishes a prima facie case, the burden shifts to the employer 

to articulate a legitimate, nonretaliatory reason for its employment decision. See 
Laosebikan v. Coca-Cola Co., 167 F. App’x 758, 764 (11th Cir. 2006). The ultimate 
burden of proving by a preponderance of the evidence that the employer’s reason is 

pretext for prohibited conduct remains with the plaintiff. Id. 
DCS asserts that, as to all positions, Weatherington has failed to demonstrate 
the first and third elements required for her retaliation claim, which Weatherington 
disputes. But because Weatherington’s only actionable retaliation claim is that 

concerning the principal position at Highlands Elementary school, that is the only 
claim the Court addresses here. Ultimately, due to the absence of any protected 
activity and the insufficiency of her causal allegations, Weatherington cannot 

establish a prima facie retaliation claim. 
 i. Protected Activity 
Title VII recognizes two forms of statutorily protected expression, including 

(1) opposing an employment practice made unlawful under Title VII (the opposition 
clause); or (2) charging, testifying, assisting, or participating in a Title VII 
investigation, proceeding, or hearing (the participation clause). 42 U.S.C. § 2000e–

3(a); Ceus v. City of Tampa, 803 F. App’x 235, 245 (11th Cir. 2020). 
If making a claim based on the former opposition clause, a plaintiff must have 
a “good faith, reasonable belief that the employer was engaged in unlawful 
employment practices.” Furcron v. Mail Centers Plus, LLC, 843 F.3d 1295, 1311 

(11th Cir. 2016) (quoting Little v. United Tech., Carrier Transicold Div., 103 F.3d 
956, 960 (11th Cir. 1997)). Under this standard, a plaintiff must show both that she 
subjectively believed her employer was engaged in unlawful employment practices 

and that her belief was objectively reasonable. Id. 
The latter participation clause protects conduct, for example, associated with 
or following the formal filing of an EEOC charge; however, it offers no protections 
to employees who participate in internal business decisions or investigations apart 

from a formal EEOC charge. See, e.g., Ceus, 803 F. App’x at 245; E.E.O.C. v. Total 
Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000). It now bears repeating that 
“[u]nfair treatment, absent discrimination based on race, sex, or national origin, is 

not an unlawful employment practice under Title VII.” Coutu v. Martin Cty. Bd. of 
Cty. Comm’rs, 47 F.3d 1068, 1074 (11th Cir. 1995) (holding employee’s written 
grievance to employer containing conclusory race discrimination allegations lacked 

supporting proof and thus did not constitute protected activity). 
The sole basis for Weatherington’s retaliation claim is the Settlement 
Agreement she reached with DCS in February 2016, (see Doc. 18-8), which 

followed her removal from Honeysuckle as the principal and facilitated her transfer 
to Dothan High as an assistant principal. In this instance, even if Weatherington 
subjectively believed that DCS was engaging in unlawful discrimination, the parties’ 
conduct following the removal does not support an objectively reasonable belief that 

DCS was unlawfully discriminating against her. For Weatherington’s part, she made 
no mention to anyone at DCS that her discontentment with the removal stemmed 
from her belief that it was discriminatory. In fact, she only communicated about the 

transfer with two DCS officers: Ledbetter and then-Board-member Jones. She spoke 
to Ledbetter upon receiving notice of the transfer, but rather than vocalizing her 
belief that his desire to “go in a different direction” was discriminatory, she only told 
him that she would not sign the letter and promptly left the meeting. (Doc. 18-1, pp. 

28-29.) Jones, to whom she spoke immediately after meeting with Ledbetter, 
confirmed that Ledbetter removed her from Honeysuckle based on Ledbetter’s 
desire to take Honeysuckle in “a different direction.” (Id., p. 33.) From the facts, 
Jones said nothing to insinuate that racial bias prompted Ledbetter’s conduct, and 
neither did Weatherington at the time. 

From the record, the Court cannot glean discriminatory motive on the part of 
DCS either before or after the removal, nor can it point to any moment at which DCS 
would have learned that Weatherington believed DCS’s decision to remove her from 

Honeysuckle was discriminatory. Weatherington presents no evidence that she 
opposed the removal on grounds of discrimination, and further fails to show that 
DCS would have been able to infer as much. See Damon v. Fleming Supermarkets 
of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (“[Courts] are not in the business 

of adjudging whether employment decisions are prudent or fair. Instead, our sole 
concern is whether unlawful discriminatory animus motivates a challenged 
employment decision.”). 

While it is true that Weatherington spoke with AEA and retained counsel, 
there is no indication or evidence that any of these representatives made any mention 
of discrimination in their conversations with DCS personnel, even in the course of 
negotiating the Settlement Agreement. True, formal or informal complaints of 

discrimination may constitute protected activity under Title VII, but excluding any 
mention of discrimination whatsoever from those complaints removes any Title VII 
protections where inferences of discrimination are not objectively reasonable. See, 

e.g., Ceus v. City of Tampa, 803 F. App’x 235, 248 (11th Cir. 2020) (employee’s 
letter demanding a reimbursement for forced leave time that did not reference race 
or discrimination does not fall within Title VII’s ambit); Herron-Williams v. 

Alabama State Univ., 805 F. App’x 622, 632 (11th Cir. 2020) (email sent by 
employee with only one unsubstantiated and conclusory allegation of discrimination 
was not legally protected activity); Biggers v. Koch Foods of Alabama, LLC, 461 F. 

Supp. 3d 1176, 1186 (M.D. Ala. 2020) (internal complaints that made no mention 
of racial discrimination not protected conduct). 
Unfair treatment is not necessarily unlawful discrimination, and in this case, 
it is not objectively reasonable to believe that DCS’s negative treatment of 

Weatherington was based on race, particularly when acknowledging that 
Weatherington’s replacement at Honeysuckle was a black male. (Doc. 18-1, p. 194.) 
In short, the Settlement Agreement reached between DCS and Weatherington (along 

with the preceding negotiations) in 2016 does not constitute statutorily protected 
activity under Title VII; thus, granting summary judgment on her retaliation claim 
relating to the Highlands principal position is proper. 
 ii. Causal Connection 

Even assuming arguendo that Weatherington has adduced sufficient evidence 
to demonstrate she engaged in protected activity, she still cannot establish the causal 
link requirement. To do so, a plaintiff must prove that the relevant decisionmaker 

knew of the protected activity and that the protected activity and adverse 
employment action were not wholly unrelated. See Johnson v. Coffee Cty. Comm’n, 
714 F. App’x 942, 945 (11th Cir. 2017). “A ‘close temporal proximity’ between the 

protected expression and an adverse action is sufficient circumstantial evidence of a 
causal connection for purposes of a prima facie case.” Higdon v. Jackson, 393 F.3d 
1211, 1220 (11th Cir. 2004). 

Weatherington applied for the Highlands Elementary Principal position in 
June 2018 – more than 2 years after finalizing her Settlement Agreement in February 
2016. This length of time is certainly not “very close” by ordinary standards, and for 
Title VII purposes is so substantial that Weatherington’s claim must fail as a matter 

of law. Id. at 1221 (3-month period insufficient to show causal relation); Simpson v. 
State of Alabama Dep’t of Human Res., 501 F. App’x 951, 955 (11th Cir. 2012) 
(outer limit for the test of close temporal proximity sits at around three or four 

months). 
The record is further void of any evidence indicating the hiring personnel had 
“actual awareness” of Weatherington’s Settlement Agreement. The “actual 
awareness” requirement “rests upon common sense…. A decisionmaker cannot have 

been motivated to retaliate by something unknown to him.” Brungart v. BellSouth 
Telecommc’ns, Inc., 231 F.3d 791, 799 (11th Cir. 2000). Hence, the knowledge of a 
non-decisionmaker cannot be imputed to the decisionmaker. Id. at 800. Hiring for 

the Highlands position was conducted by unnamed persons on an interview panel, 
and Dr. Edwards made the final decision to recommend hiring Barker to the Board. 
Dr. Edwards, who claims not to have had any knowledge of the Settlement 

Agreement until this lawsuit was filed in 2019, did not become superintendent of 
DCS until February 2018. (Doc. 18-2, p. 2.) Based on this timeline and the evidence 
in her affidavit, she would have had no knowledge of the Settlement Agreement at 

the time she made the hiring recommendation for the Highlands position in June 
2018. (Id.) Weatherington not only neglects to dispute this, but also stated in her 
deposition that she “didn’t accuse Dr. Edwards of retaliating none (sic).” (Doc. 18-
1, p. 151.) Moreover, Weatherington did not even interview for the position, so her 

name would not have been among those presented to Dr. Edwards for the final 
selection. Therefore, a retaliation claim against the Board based upon Dr. Edwards’ 
conduct cannot stand. 

It would be speculative, at best, to assert that any of the decisionmakers in this 
case – be it the interview committee, Dr. Edwards, or the Board – were influenced 
not to hire Weatherington based on racial bias. But a mere “hunch” that another 
employee with knowledge of the protected expression informed a decisionmaker of 

the protected expression does not constitute the “significant probative evidence” 
necessary to avoid summary judgment. See Raney v. Vinson Guard Serv., Inc., 120 
F.3d 1192, 1198 (11th Cir. 1997). The record lacks the substantive evidence that 
would be necessary to infer causation in this case, and summary judgment is due to 
be granted on Weatherington’s remaining retaliation claim. 

d. Equal Pay Act 
Weatherington asserts an additional claim, premised on the male comparators’ 
salaries set forth above, that DCS paid her less than similarly situated black male 

principals and that the pay disparity constitutes wage discrimination under the Equal 
Pay Act, 29 U.S.C. § 206(d) (“EPA”).13 To prevail on her EPA claim, Weatherington 
must demonstrate a prima facie case that DCS paid Weatherington less than it paid 
men “for equal work for jobs which require equal skill, effort, and responsibility, 

and which are performed under similar working conditions.” 29 U.S.C. § 206(d)(1); 
see Steger v. Gen. Elec. Co., 318 F.3d 1066, 1077–78 (11th Cir. 2003). 

13 In the Complaint, Weatherington challenges the pay disparity under the heading “Equal Pay Act 
Violation,” which ostensibly implies that she brings this claim under the Equal Pay Act. (Doc. 1, 
p. 10.) However, in Paragraph 24 of the Complaint, she notes that the disparities violate “Title VII 
of the Civil Rights Act of 1964.” (Id.) True, a plaintiff can sue his employer under Title VII and 
the EPA, and the Eleventh Circuit has explained that the similarities and differences between these 
statutory remedies hinge on the plaintiff’s burden of proof. See Miranda v. B & B Cash Grocery 
Store, Inc., 975 F.2d 1518, 1526 (11th Cir. 1992). Whereas the EPA requires a plaintiff to meet a 
“fairly strict” burden of proving she did “substantially similar” work for less pay before shifting 
the burden of producing an affirmative defense on to the defendant, Title VII only requires a 
plaintiff to show a more “relaxed standard of similarity” between the jobs, but must prove an intent 
to discriminate on the basis of sex. Id. For the sake of completeness, the Court notes that to the 
extent Weatherington alleges wage discrimination under Title VII, her claim is unavailing. Just as 
she has neglected to produce any evidence that DCS’s legitimate, non-discriminatory salary matrix 
was pretext for discriminatory conduct, she has likewise neglected to make a showing that DCS 
engaged in intentional discrimination when it paid her male comparators more based on their 
completion of a probationary period. See Reddy v. Dep’t of Educ., Alabama, 808 F. App’x 803, 
813 (11th Cir. 2020) (gender neutral reason for pay disparity precluded finding of wage 
discrimination under both the EPA and Title VII). 
If Weatherington is able to make such a showing, DCS may avoid liability by 
presenting an affirmative defense that the payments were made pursuant to “(i) a 

seniority system; (ii) a merit system; (iii) a system which measures earnings by 
quantity or quality of production; or (iv) a differential based on any other factor than 
sex.” Irby v. Bittick, 44 F.3d 949, 954 (11th Cir.1995). This heavy burden requires 

DCS to demonstrate that “the factor of sex provided no basis for the wage 
differential.” Steger, 318 F.3d at 1078 (citation omitted). Finally, Weatherington 
may attempt to demonstrate that a genuine issue of material fact exists with respect 
to the defendant’s affirmative defense by presenting evidence that the reasons 

proffered for the wage differential were merely pretext for unlawful wage 
discrimination on the basis of gender. See Irby, 44 F.3d at 954. 
DCS argues there has been no violation of the Equal Pay Act. First, it contends 

the inequality in pay was due to Weatherington’s probationary status. Second, it 
claims the wage differential was, to quote the statute, based on a “factor other than 
sex.” This factor was the completion of a probationary period, as it claims Ala. Code 
§ 16-8-23 makes compulsory. At the outset, the Court recognizes it is undisputed 

that salaries awarded under probationary principal contracts are lower than those 
awarded under three-year principal contracts that typically follow probationary 
contracts. It is further undisputed that Weatherington herself was employed pursuant 

to such a probationary principal contract. And for the reasons discussed below, the 
Court concludes that DCS is entitled to summary judgment on Weatherington’s EPA 
claim. 

 i. Prima Facie Case and Comparators 
Though her EPA claim is ultimately nonmeritorious, Weatherington has 
identified sufficient evidence to suggest that males Jeffrey Torrence and Darius 

McKay were paid comparably more than she was paid during her tenure as principal 
at Honeysuckle Middle School for the job of principal. Notably, to meet her burden, 
Weatherington must show that the jobs at issue are “substantially equal” in terms of 
skill, effort and responsibility; however, she need not show that the skills or 

qualifications of the males holding the positions are substantially equal to her own. 
See Arrington v. Cobb Cty., 139 F.3d 865, 876 (11th Cir. 1998), as amended (May 
28, 1998). The controlling factor for consideration is the job content, though job 

titles may also be considered in the court’s assessment. Id. 
DCS disputes that Weatherington has made a prima facie showing on the 
grounds that she was awarded a probationary contract, and that it would be 
imprudent to compare Weatherington’s probationary contract salary to that of a 

principal who has already completed his probationary period. But it is important to 
bear in mind that the prima facie case under the EPA is established by comparing 
the jobs held by female and male employees, and not by comparing the relative 

backgrounds and qualifications of the individuals in those positions. See Brock v. 
Georgia Sw. Coll., 765 F.2d 1026, 1032 (11th Cir. 1985), disapproved of on other 
grounds by McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988). Thus, neither 

DCS nor this Court can rely on Weatherington’s probationary status, alone, to defeat 
her prima facie showing. 
To the contrary, all evidence in the record supports a finding that the middle 

school principal positions held by Weatherington, Torrence, and McKay entailed 
substantially similar, if not the same, responsibilities and were held under 
substantially similar conditions. In fact, based on the record, the Court recognizes 
that all three individuals were placed in middle schools facing certain struggles.14 

Weatherington was placed at Honeysuckle – a school that by DCS’s own account 
was “struggling.” (Doc. 18-4, p. 2.) Torrence was also placed at Honeysuckle as the 
principal, where he replaced Weatherington when she was transferred away in 2016 

pursuant to the Settlement Agreement. McKay was the principal at Girard Middle 
School, which Ledbetter also described as a school “facing some struggles.” (Id.) 
DCS’s assertions that the unique professional circumstances facing Torrence and 
McKay in their respective school environments set them apart overlook the fact that 

Weatherington herself worked in a “struggling” school. Yet Weatherington was paid 

14 DCS does not explain the specific duties and responsibilities that each principal held or how 
they might differ from school to school. Instead, it argues that the working conditions were 
different because certain middle schools, i.e., Honeysuckle and Girard, faced certain struggles, 
though it does not apprise the Court of what those struggles were. (See Doc. 19, pp. 50-51.) 
$80,659.50 annually, as compared to Torrence and McKay’s respective annual 
salaries of $95,220.00. To this end, DCS’s argument that Torrence and McKay 

worked principal jobs incomparable to Weatherington’s principal job is unavailing, 
as it presents a question of fact on which reasonable jurors could differ. And because 
Weatherington’s probationary status is better considered as part of DCS’s 

affirmative defense, the Court moves on to the next stage in its assessment. 
 ii. Affirmative Defense 
While the Court finds that Weatherington has met her prima facie burden, 
DCS more than successfully refutes her EPA claim in its entirety. As it explains in 

its motion, the wage differential Weatherington challenges is not based upon gender, 
but rather on each principal’s prior relevant experience under a matrix. More 
precisely, DCS awards all first-time principals a probationary contract to last for a 

period of one to two years. Only upon completion of this probationary period are 
principals eligible for a three-year contract and higher annual salary. (See Doc. 18-
5.) But Weatherington herself was not eligible for such a contract when she was 
hired as a principal at Honeysuckle. 

This affirmative defense fits squarely into the general exception to the EPA, 
which allows employers to submit evidence that the wage differential is based on 
any factor other than sex. 29 U.S.C. § 206(d)(1). The Eleventh Circuit has 

interpreted this language to include such factors as “unique characteristics of the 
same job; ... an individual’s experience, training or ability; or ... special exigent 
circumstances connected with the business.” Irby, 44 F.3d at 955 (quoting Glenn v. 

Gen. Motors Corp., 841 F.2d 1567, 1571 (11th Cir. 1988)). 
At all times relevant to Weatherington’s EPA claim, she was employed under 
a probationary contract and was thus considered a probationary principal. Torrence 

and McKay, too, were once employed as probationary principals, but had completed 
their probationary periods and been elevated to contract principal status pursuant to 
three-year employment contracts. Notably, while employed as probationary 
principals, Torrence and McKay were paid $80,251.86 and $78,164.47, respectively. 

These amounts are less than Weatherington’s probationary salary of $80,659.50, and 
they indicate clearly to the Court that DCS’s salary matrix and probationary contract 
distinction are gender neutral. 

Moreover, Weatherington’s comparators were awarded salaries based upon 
meaningful differences in experience level. Torrence spent two years as a principal 
prior to attaining contract principal status and taking over at Honeysuckle (time 
earned during his probationary period), and McKay had amassed two years of 

experience as a principal, plus six years of experience as an assistant principal in a 
different school system. Again, Weatherington had never held a principal position. 
This comparative difference in experience alone serves as a valid justification for 

the male principals’ wage differentials that the Court will not second-guess 
retroactively, especially since it appears that Weatherington actually earned more 
when all three individuals’ probationary salaries are compared. See Irby, 44 F.3d at 

956 (experience is an acceptable factor other than sex, so long as it is not used as a 
pretext for gender discrimination); Blackman v. Fla. Dep’t of Bus. & Prof’l 
Regulation, 599 F. App’x 907, 912 (11th Cir. 2015) (differences in experience and 

education between male and female employee sufficient to demonstrate a factor 
other than sex). 
 iii. Evidence of Pretext 
Weatherington offers no evidence to create a triable issue that DCS’s salary 

matrix was offered as pretext for gender discrimination. She concedes that she was 
employed under a probationary contract, (Doc. 18-1, p. 49), and beyond shallowly 
questioning the distinction between probationary and contract status, (Doc. 26, p. 

23), proposes nothing to rebut DCS’s legitimate, non-discriminatory methods for 
determining principal salaries. A plaintiff cannot show pretext simply by disagreeing 
with the wisdom of an employer’s decision. See, e.g., Mahone v. BBG Specialty 
Foods, Inc., No. 1:16CV00655-SRW, 2018 WL 1526336, at *8 (M.D. Ala. Mar. 28, 

2018). And this Court is not under any obligation to consider mere conclusory 
testimony. See Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642 
and n. 6 (11th Cir. 1998). Weatherington’s glaring failure to present any evidence 
that undercuts DCS’s gender neutral salary matrix is a clear indication that this claim 
cannot stand; accordingly, the Court grants summary judgment on her EPA claim. 

VII. CONCLUSION 
For the foregoing reasons, the Board’s Motion for Summary Judgment, (Doc. 
18), is GRANTED as to all claims in the Complaint and this case is dismissed with 

prejudice. Costs shall be taxed against the Plaintiff. 
DONE, this 28th day of December, 2020. 

 /s/ R. Austin Huffaker, Jr. 
 R. AUSTIN HUFFAKER, JR. 
 UNITED STATES DISTRICT JUDGE